CITY OF AKRON ET AL., APPELLANTS, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Akron v. Pub. Util. Comm. (1977),
51 Ohio St. 2d 27.]

(No. 76-1176—Decided July 6, 1977.)

28

*Messrs. Steer, Strauss, White & Tobias, Mr. Robert J. White, Mr. Theodore K. High* and *Mr. F. Bruce Abel,* for appellants.

*Mr. William J. Brown,* attorney general, *Mr. Charles S. Rawlings* and *Mr. John W. Bentine,* for appellee Public Utilities Commission.

*Messrs. Jones, Day, Reavis & Pogue, Mr. Victor E. De-Marco, Mr. Lanty L. Smith, Mr. Roy F. Ryan III, Mr. Donald W. Morrison, Mr. Charles B. Ballou* and *Mr. Ronald L. Orloff,* for intervening appellee Ohio Bell Telephone Company.

PAUL W. BROWN, J. In 1969, after this court's decision in *Cincinnati Gas & Electric* v. *Pub. Util. Comm., supra* (173 Ohio St. 473), federal tax law was modified with respect to the use of accelerated depreciation for public utilities. Present Section 167(*l*) of the Internal Revenue Code, and others which authorize the accelerated depreciation method, are somewhat tangled, but their effect is clear, as every witness before the board agreed. The statute requires that if a public utility uses accelerated depreciation, it must normalize. If normalization is denied and the utility is required to flow through, the utility is disqualified from using accelerated depreciation and must use straight-line. Since the **accounting procedure for normalization uses straight-line** depreciation which then creates a reserve for the tax obligation resulting from the tax deferral, the effect is that all of the rates and expenses stay the same in any event, but the utility loses the advantage of using the reserve fund as cost-free capital, which it would have if it uses both the accelerated depreciation method and normalization.

The provisions of this new law applied only to post-1969 property, and only if the utility elected to use accelerated depreciation. Ohio Bell, which had formerly used straight-line depreciation, elected to switch to accelerated depreciation, and informed the commission of this decision by letter in April 1970, and has used accelerated depreciation and normalized in the years since. Another effect of the federal law is that if the utility switches back to straight-line (as it presumably would be required to do if not permitted to normalize), it would immediately have to file amended returns for earlier years using straight-line, and would accordingly have to pay as taxes all the amounts which had been deferred in those years. This would amount to a very substantial sum, for in the test year alone, Ohio Bell deferred over 45 million dollars.

Clearly, depreciation is an elastic concept which is designed to function differently under different circumstances. One need be neither an economist nor an accountant to perceive that the intention of Congress in allowing accelerated depreciation is to stimulate continuing expansion and upgrading of facilities, while annual depreciation for the rate-making purpose must, in fairness to ratepayers current or remote, be more directly related to the economic value of the property over some rational projection of its useful life.

Since we conclude that the commission's inclusion in the ratemaking formula as an expense for the test year of the tax figure arrived at by normalizing tax liability computed by the accelerated depreciation method was neither unreasonable nor unlawful, and that under these facts the determination by the commission concerning normalization is in the best interests of the ratepayers, the order of the commission is affirmed.

*Order affirmed.*

O'NEILL, C. J., HERBERT, W. BROWN and SWEENEY, JJ., concur.

CELEBREZZE and LOCHER, JJ., dissent.

LOCHER, J., dissenting. This court has held previously that the only federal income tax expense which should be considered for rate-making purposes is that of taxes *actually paid*. *Cincinnati Gas & Electric Co.* v. *Pub. Util. Comm.* (1962), 173 Ohio St. 473; *Ohio Edison Co.* v. *Pub. Util. Comm.* (1962), 173 Ohio St. 478. However, the majority's decision affirming the commission's inclusion of Ohio Bell's normalized tax expense figure in the rate-making process explicitly abrogates this statement of law.

Through the utilization of accelerated depreciation, instead of straight-line depreciation, Ohio Bell increased its tax deduction. An increased tax deduction reduces the tax burden of the utility and correspondingly the revenue that must be acquired from its consumers. At least, this was the prior law of Ohio. By affirming the use of normalization, the majority approves the accounting legerdemain that turns a tax savings into an actual tax expense for the rate-making calculations. Simply stated, this means that Ohio Bell is being reimbursed by its ratepayers for over 45 million dollars of taxes, which Ohio Bell has *not* paid to the United States Treasury.

Normalization of this tax benefit creates a windfall for the utilities to the detriment of the ratepayers. Contrary assertions aside, the use of accelerated depreciation results in an actual tax savings, not a deferral or postponement of payment.

"'Ratemakers have discovered that if the total enterprise is either expanding or stable, the use of *accelerated depreciation does not merely defer taxes, but eliminates them entirely*. (See *FPC* v. *Memphis Light, Gas & Water Div.* (1972), 411 U. S. 458, 460; Note, *The Effect on Public-Utility Rate Making of Liberalized Tax Depreciation under Section 167* (1956), 69 Harv. L. Rev. 1096, 1102.)" *Los Angeles* v. *Pub. Util. Comm.* (1975), 15 Cal. 3d 680, 686, 542 P. 2d 1371.

Furthermore, in *Cincinnati Gas & Electric Co.* v. *Pub. Util. Comm., supra,* at page 474, this court, citing with approval from the commission's decision, laid to rest this very contention:

"'* * * [W]e must reject the theory that a deferral of

tax liability arises from the use of accelerated depreciation, and consequently must reject normalization of taxes for rate-making purposes; no such deferral exists and no such liability will arise. We will allow only the expense incurred, that is, the federal income tax *actually paid* by the company. It is our opinion that this treatment will benefit both the ratepayers and the utility.' "

Thus, the tax will never catch up and the result is, for the test year alone, a net tax savings of over $45,000,000 for Ohio Bell. Ironically, while the normalization of this tax benefit is allegedly justified as preventing this phantom tax expense from being imposed upon future ratepayers, normalization forces current ratepayers to finance benefits only to be enjoyed by future consumers. The mandating of normalization is synonymous with the compelling of present consumers to make interest-free loans to Ohio Bell with repayment *in futuro.*

Ohio Bell presented to the commission and this court a *fait accompli.* In 1970, Ohio Bell began using accelerated depreciation. Internal Revenue Code Section 167(*l*), effective 1969, requires a public utility using accelerated depreciation to normalize. Ohio Bell argued that adherence to the law in Ohio would result in the detrimental loss of this tax savings, while normalization would directly benefit the utility and, perhaps, indirectly benefit future ratepayers. Thus, the *fait accompli*: either change the law in order that we may benefit or no one will benefit. However, the impact of Ohio Bell's argument is lessened by the unanswered question of why Ohio Bell did not use accelerated depreciation before 1970. From 1954 to 1970, when the tax benefit derived from accelerated depreciation could have been passed on to the ratepayers, Ohio Bell maintained straight-line depreciation and thus paid untold millions of dollars of similar possible tax savings to the United States Treasury. Ohio Bell stresses the inequity of continued adherence to the interdiction espoused in *Cincinnati Gas & Electric Co.* v. *Pub. Util. Comm., supra* (173 Ohio St. 473), because it would deny them the *very* benefits their actions previously denied the ratepayers.

A necessary addendum to the consideration of the in-

stant cause is an understanding of the rate-making process in Ohio. The utility's rates are dependent upon two factors: the rate of return and the reimbursement of expenditures. *Cleveland* v. *Pub. Util. Comm.* (1956), 164 Ohio St. 442. However, the first factor is misleading, because the rate of return is applied to a *hypothetical company*, whose statutory rate base is greater than the actual amount of debt and capital stock of the subject utility. The statutory rate base is only an *estimate* of what it would cost to *reproduce* a given utility's property minus depreciation. The reproduction cost considered in the rate base will now almost always, because of inflation, be *greater than the actual amount of the capital of the utility*. The net effect, after many years of operation by Ohio Bell and changes in cost during those years, is that the statutory rate base would have only a remote relationship to the net investment in Ohio Bell. The rate of return is, therefore, misleading, because it is not earned on the lower actual investment, but on the inflated statutory rate base of a hypothetical company.

Presently, Ohio Bell earns a return on money not invested. The approval of normalization could well be a superfluous and pernicious sequel to the existing fairy tale of utility ratemaking in Ohio. The cast of characters *will include* the *hypothetical company* and the *phantom expense*. However, even the most benign fairy tale may contain a subliminal horror story. The advantages of normalization for Ohio Bell are readily apparent; the advantages for the ratepayers are a mere apparition; and the dangers for the ratepayers remain undisclosed.

In the end, our only alternative may be the approval of normalization. Still, our *imprimatur* should not be impressed upon this aberration until we have at least a modicum of information upon which we may effectively exercise our judicial function.

I would remand this cause to the commission to conduct the thorough study, now absent, considering all the lawful alternatives in the calculation of this federal tax expense in light of Internal Revenue Code Section 167(*l*), the anomalies of the Ohio rate-making process and the in-

terests of the ratepayers, pursuant to the commission's statutory duty to insure the reasonableness of a utility's rates.* I, therefore, respectfully dissent from the majority's affirmance of the commission's order.

CELEBREZZE, J., concurs in the foregoing dissenting opinion.

---

*The California Supreme Court, in a similar controversy involving normalization, remanded the cause to its commission with instructions to find a lawful alternative to the adverse effects upon the ratepayer of normalization. *Los Angeles* v. *Pub. Util. Comm.* (1975), 15 Cal. 3d 680, 542 P. 2d 1371.